ALDRIDGE et al. v. HAMLIN et al.*
(No. 886.)

(Court of Civil Appeals of Texas. Amarillo. March 4, 1916. Rehearing Denied March 22, 1916.)

1. ELECTIONS ☞83—VOTERS—RIGHT TO VOTE —POLL TAX.
Where an elector on the 1st day of January, 1912, was subject to payment of a poll tax and failed to pay the same, his vote at an election October 18, 1913, is properly rejected.
[Ed. Note.—For other cases, see Elections, Cent. Dig. §§ 77–81; Dec. Dig. ☞83.]

2. ELECTIONS ☞94—VOTERS—CONVICTION.
Where a voter had been convicted of felony and his sentence suspended under Acts 32d Leg. c. 44, which was held unconstitutional, the suspension was void and the voter was not qualified, not having been pardoned.
[Ed. Note.—For other cases, see Elections, Cent. Dig. § 91; Dec. Dig. ☞94.]

3. ELECTIONS ☞295(1)—VOTERS—EVIDENCE.
Where the vote of two Mexicans was questioned, testimony that the precinct in which they lived was sparsely settled, that no other Mexicans lived there, and that such persons had not resided there for sufficient time to vote, is admissible and will support a finding rejecting their ballots.
[Ed. Note.—For other cases, see Elections, Cent. Dig. § 297; Dec. Dig. ☞295(1).]

4. ELECTIONS ☞72—VOTERS—RESIDENCE.
Where one whose ballot was rejected owned a farm in the county and intended to return whenever he could find some one who would live with and care for him, the ownership of the farm did not constitute a residence, it appearing that he actually was in another county.
[Ed. Note.—For other cases, see Elections, Cent. Dig. §§ 67, 68, 70; Dec. Dig. ☞72.]

5. ELECTIONS ☞295(1)—VOTERS—EVIDENCE.
In an election contest, evidence *held* sufficient to warrant the rejection of a voter's bal-

lot on the ground that he resided in another state.
[Ed. Note.—For other cases, see Elections, Cent. Dig. § 297; Dec. Dig. ☞295(1).]

6. ELECTIONS ☞73—VOTERS—RESIDENCE.
Where one actually resided in the county and sent his children to school there, the fact that he voted at a school election in another state and paid poll taxes there, it appearing that he wanted to keep his legal residence in such state to acquire public lands, will not preclude him from voting in the county of his residence.
[Ed. Note.—For other cases, see Elections, Cent. Dig. §§ 69, 70; Dec. Dig. ☞73.]

7. ELECTIONS ☞73—VOTERS—REMOVAL.
That a resident, in the discharge of his duties, temporarily removed from the county, being assured by the railroad company for which he worked that he would be returned, will not, where he retained his family home in the county, deprive him of his residence therein, and right to vote.
[Ed. Note.—For other cases, see Elections, Cent. Dig. §§ 69, 70; Dec. Dig. ☞73.]

8. ELECTIONS ☞300—VOTERS—QUALIFICATIONS.
In an election contest, the question whether a voter had resided in the county for a sufficient length of time to vote, *held* a question of fact.
[Ed. Note.—For other cases, see Elections, Cent. Dig. §§ 308–313; Dec. Dig. ☞300.]

9. ELECTIONS ☞72—VOTERS—QUALIFICATIONS.
A voter who managed a business in Texas took his meals in a town across the state line in New Mexico, but he slept and kept his effects in the building where the business was carried on. *Held*, that his residence was in Texas and he was entitled to vote therein.
[Ed. Note.—For other cases, see Elections, Cent. Dig. §§ 67, 68, 70; Dec. Dig. ☞72.]

10. ELECTIONS ☞72—VOTERS—RESIDENCE.
That a voter who had resided in the county and state for a sufficient length of time intended ultimately to return to a distant state, does not deprive him from acquiring a legal residence and the right to vote.
[Ed. Note.—For other cases, see Elections, Cent. Dig. §§ 67, 68, 70; Dec. Dig. ☞72.]

11. ELECTIONS ☞73—RESIDENCE—TEMPORARY REMOVAL.
That one who owned a farm in the county and resided there, temporarily removed during a season of drought, but returned, does not deprive him of his residence in the county, and he may vote therein.
[Ed. Note.—For other cases, see Elections, Cent. Dig. §§ 69, 70; Dec. Dig. ☞73.]

12. ELECTIONS ☞73—VOTERS—TEMPORARY REMOVAL.
That a voter temporarily removed from the county, but intended to return and resume business therein, does not, where he retained his home in the county, work a loss of residence, depriving him of the right to vote.
[Ed. Note.—For other cases, see Elections, Cent. Dig. §§ 69, 70; Dec. Dig. ☞73.]

13. ELECTIONS ☞295(1)—VOTERS—ACTIONS— EVIDENCE.
In an election contest, evidence *held* sufficient to sustain a finding that a challenged voter had a residence in the county and was entitled to vote.
[Ed. Note.—For other cases, see Elections, Cent. Dig. § 297; Dec. Dig. ☞295(1).]

---

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes
*Application for writ of error pending in Supreme Court.

**14. ELECTIONS ☞234—VOTERS—EVIDENCE.**

Where from practical considerations a voter had changed his mind as to his vote on the question of a change of the county seat, his ballot will not be rejected because of subsequent attempts to coerce him into voting as he did.

[Ed. Note.—For other cases, see Elections, Cent. Dig. § 205; Dec. Dig. ☞234.]

**15. ELECTIONS ☞295(1)—CONTEST—VOTERS—RESIDENCE—EVIDENCE.**

In an election contest where a voter's ballot was questioned, evidence *held* sufficient to sustain a finding that he had acquired residence in the county.

[Ed. Note.—For other cases, see Elections, Cent. Dig. § 297; Dec. Dig. ☞295(1).]

**16. ELECTIONS ☞73 — CONTEST — VOTERS — RESIDENCE.**

Where a voter, while waiting to get a residence in a Texas town, temporarily removed to an adjacent New Mexico town, the fact of his temporary residence, that he acted as if he was a resident of New Mexico, will not, it appearing that he returned, deprive him of his right to vote in Texas.

[Ed. Note.—For other cases, see Elections, Cent. Dig. §§ 69, 70; Dec. Dig. ☞73.]

**17. CONSTITUTIONAL LAW ☞35—EXERCISE OF POWERS—MANDATORY PROVISIONS.**

Where a power is expressly given by the Constitution and the mode of exercise is prescribed, such mode is exclusive.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 34½; Dec. Dig. ☞35.]

Appeal from District Court, Parmer County; D. B. Hill, Judge.

Election contest by J. H. Aldridge and others against J. D. Hamlin and others. From a judgment for defendants, plaintiffs appeal. Affirmed.

Carl Gilliland, of Hereford, and Madden, Trulove, Ryburn & Pipkin, of Amarillo, for appellants. W. Boyce, of Amarillo, and Sam G. Bratton, of Clovis, N. M., for appellees.

HENDRICKS, J. This case involves the contest of an election, over the removal of the county seat of Parmer county, Tex., from Farwell to Parmerton. The county judge, in announcing the returns and declaring the result of the election, stated a total of 228 votes, 110 for the county seat remaining at Farwell, 114 for removal to Parmerton, three for Friona, and one for Bovina. As canvassed, Parmerton not having received the majority (its vote being equal to Friona and Farwell), the result was declared in favor of the county seat remaining at Farwell. The election was ordered on September 15, 1913, and held October 18, 1913.

The district judge concluded that the vote of one of the boxes was incorrectly shown in the returns and the ballots in that box were recounted, and, after passing upon the qualifications of certain voters, challenged by both sides, and rejecting two ballots, on account of their condition, announced a numerical result as follows: "For remaining at Farwell, 100 votes; for removal to Bovina, 1 vote; for removal to Parmerton, 95 votes; for removal to Friona, 3 votes;" the

trial judge also declaring, "that the true result of said election was in favor of the county seat remaining at Farwell."

The trial court sustained 17 challenges offered by the contestees as to the qualifications of voters casting their ballots for removal to Parmerton, which were deducted by the court from Parmerton's vote. The action of the trial court rejecting ten of said voters is not excepted to in this court. The appellants, however, attack the rulings of the court as to the qualification of the following voters, deducted from the total vote for removal to Parmerton: T. M. Yelverton, Wilbur Ford, A. J. Grim, S. G. Deanda, Meteo Romo, Jim Martin, and W. A. Anderson.

[1] W. A. Alderson (or Anderson) was a claimant of public land in New Mexico, but the court held he was in reality a resident and citizen of Parmer county, Tex., on the theory that his evanescent visits to his claim and temporary stay of very short duration in New Mexico did not manifest a real intention to reside on the land, or make that state his home; that he worked for one Jersig, a ranch owner in Texas, continuously since 1910, and for a year or more previous to the election was foreman of Jersig's ranch; that some time during 1912 he relinquished his claim in New Mexico, concluding that he could not make his proof of occupancy. The court had the right to conclude that he was a resident of the state of Texas, on the first day of January, 1912, and, being subject to the payment of a poll tax, and not having the same, was not entitled to vote.

[2] The court found that the voter Wilbur Ford was convicted of a felony (theft of cattle), and his punishment assessed at two years in the penitentiary; that he had not been pardoned, nor his civil rights restored. The trial judge had suspended the sentence of this defendant under the provisions of chapter 44, Acts of the Thirty-Second Legislature. This act, affecting this particular question, was held unconstitutional in the case of Snodgrass v. State (Cr. App.) 150 S. W. 162, 41 L. R. A. (N. S.) 1144, and in a companion case (Cr. App.) 150 S. W. 178. The law was amended and held constitutional on account of the elimination of certain features, in Baker v. State, 70 Tex. Cr. R. 618, 158 S. W. 998. We are disposed to follow the Court of Criminal Appeals on this question, and hold that the sentence of suspension was void, and that the voter was not qualified.

Deanda and Romo, whose votes were deducted by the court from Parmerton's total, were Mexicans. They began to work for the railroad company on the section at Bovina in September, 1913, and left in November, 1913.

[3] Another Mexican, who was a section hand upon the same section, and who voted

at the same election, testified that Deanda and Romo began work at Bovina after he (Rubalcoba) went there. Elliott and Warren, in the employment of the railroad company, testified from the records of the company that the Mexicans began work for the railroad company in Parmer county, in September, 1913, and their work ended in November, 1913. Bovina, where these men worked, was not a large place, and the precinct is sparsely settled. Others testified as to their acquaintanceship with the people of that section and knew of no other Mexicans residing in this precinct, except those working on the section. The testimony, though of a negative character as to the residence of these Mexicans (except during the period of their employment as section hands), was sufficient to exclude the time of residence to qualify them as eligible voters. This character of testimony is permissible and relevant. McCormick v. Jester, 53 Tex. Civ. App. 306, 115 S. W. pp. 282, 283.

The finding of the trial court, as to the residence of Jim Martin in Texas, making him eligible to a poll tax, which he failed to pay, is so fully sustained by the voter's own testimony, it is unnecessary to discuss it.

[4] The voter A. J. Grim, rejected by the court, was an old man, unmarried and unable to take care of himself. He came to Parmer county in 1906, bought some land and improved it for the purpose of making the same a tenant farm and home, "provided he could get some one there with whom he could stay." He worked at a hotel in Bovina, Parmer county, in part pay for his room and board, until the building was burned. In the fall of the year 1912 he went to Hereford, Deaf Smith county, staying at various hotels, making occasional trips to Parmer county, to look after his rents—the length of his visits being brief. He said:

"I went to Hereford to work at the hotels, because I could not get employment in Bovina and at no place close to my farm."

Part of the time while residing at Hereford, he was a hotel drummer, meeting trains at that place. His mode and manner of living at hotels at Hereford was similar to that at Bovina.

We are inclined to think that his intention to make his farm home at a time in the future, provided he could associate some one with him who would care for him, interposed a condition of expectation and contingency insufficient to constitute a residence on his farm in Parmer county, especially after he removed to Deaf Smith county, if the trial court was disposed to take that view of it.

[5] The court clearly had a right to reject the voter Yelverton. The statement of the evidence by appellants, under their thirty-first assignment of error, shows that the voter, beginning as early as April, 1913, was living and earning a livelihood in Curry county, N. M., though he claimed his home

at Bovina, Tex. There is no testimony that Yelverton ever lived in Parmer county, except the hearsay statement by one Bruner, for whom Yelverton worked, that the latter claimed that his home was in that county. He married in January, 1914, but at least to that time was found continuously working and residing in New Mexico. It was with the trial court to decide the place of his residence.

[6] As to the challenges of contestants, the appellants herein, against some of the votes cast for Farwell, and overruled by the court, we find as follows: Ike Brown was a man of family, and proved his occupancy upon public land in New Mexico. In February, 1912, he removed with his family to Parmer county, occupying a rented farm, and later moved to Farwell, his children enjoying the benefits of the public schools and at the time of trial had not returned with his family to New Mexico. The principal fact of resistance to this vote is, that Brown, in April, 1913, paid a poll tax and voted at a school election in New Mexico, stating, in substance at the time he voted, that he wanted to hold his residence there until he received his patent, and that was why he was voting and paying his taxes there. The trial court found:

"That his real home at the time he voted in New Mexico was in Texas, and that his claim of residence in New Mexico was merely technical and made for the purpose of avoiding possible trouble in securing patent to his land."

We have the personal presence of Brown, with his family residing in Texas for the period indicated, and a portion of the time sending his children to the public schools, constituting material testimony of his real intention and real abode. The matter of difference between feigned and real residence, as applied to public land, is sometimes easily discerned. The trial court evidently thought this voter had some peculiar notion that a claim of residence in New Mexico was necessary to obtain a patent, but that such manifestations of claim were not bona fide.

[7] As to the voter P. E. Turner, we think the trial court would not have been justified in finding him ineligible. For several years prior to August 1, 1913, he had lived with his family in Farwell, Parmer county, owning his own residence, and was section foreman for the Santa Fé Railway upon that date. On said date he was ordered by the company to take charge of the section at Folsom, in Potter county, Tex., and moved with his family in the section house at that place, occupying the position of section foreman until after the election. He was informed that he was transferred to fill a temporary vacancy and later would be transferred back to Parmer county, and at the time his deposition was taken had been ordered back. He kept his residence at Farwell, unrented, with a part of his household goods remaining

therein, and with an evident intention to maintain his residence in Parmer county.

[8] As to the voter Frye, his testimony on direct examination, considered alone, makes him ineligible. He said he went to Farwell in January, 1913. On cross-examination he testified that he knew at the time he voted in the election October 18, 1913, that he should have lived in Texas 12 months and in Parmer county 6; that he came to Texas from Arkansas in August, 1912, and "struck" Parmer county in September of the same year; that he was only in New Mexico long enough to gather a 120-acre crop and that he considered at the time he voted that he resided in the state 12 months and in the county 6 months preceding the election. He said, "My wife and I first moved to Farwell from Grannis, Ark., in September, 1912." It is shown that he purchased a home in the latter part of December, 1912, or in January, 1913, from one J. B. Younger, known as the Wimberly place, situated in Farwell, and lived southeast of the town before he moved to that property. The period of his residence was a fact question for the trial judge.

[9] The findings of the court as to the vote of N. E. Sidebottom are as follows:

"I find that he is a single man; the evidence does not show where he resided on January 1, 1912, and as to whether he paid a poll tax to the state of Texas for that year. He took charge of Nobles Bros. grocery house at Farwell in the spring of 1913, or before. He took his meals in Texico, N. M., March, 1913, to September, 1913. The evidence does not show where he usually slept during the six months next preceding the election. He did not pay a poll tax to the state of Texas, in Parmer county, for the year 1912. I conclude as a matter of law that the evidence is not sufficient to show that he is a qualified voter."

Mrs. Murphy and daughter testified that the voter boarded at their hotel twice; that he began to board in March, 1913, and quit boarding September 1, 1913, and roomed at their place once. Walling testified that his place of business was close to the Nobles Bros. grocery store, and that Sidebottom took charge of the business some time in the spring of 1913; that he noticed a trunk in the office and a cot by the trunk and Sidebottom informed him that it was his bed; that he often saw lights in the office at night and that nobody worked there except Sidebottom, who had exclusive control. Maddox testified that when the voter was in charge of the Nobles Bros. store in Farwell, he observed the bed and a trunk in the building. There was no hotel in Farwell, and the towns of Farwell and Texico are in reality one, divided by the state boundary—Farwell being in Texas and Texico in New Mexico. One McKay, who seems to be a frequent witness in this record, testified that Sidebottom was rooming in July, 1913, with one J. N. Williams, in Texico, and in that month, on invitation, he visited his room. The trial judge had the right to reject the testimony of Mc-

Kay, and if he believed that Sidebottom took his meals in Texico, that fact would not deprive him of the right to vote, if he resided in Texas. The testimony of Mrs. and Miss Murphy, that the voter roomed at their hotel once, is insufficient to disqualify this voter. The court could find from the testimony of Walling and Maddox that the voter used the store as his principal abode for sleeping. Whether this voter resided in Parmer county or some other county previous to the time he took charge of Nobles Bros. store is not shown. As to his poll tax, it is merely shown that he did not pay one to the state of Texas, in Parmer county, for the year 1912. The record is not satisfactory on this subject, but we are not disposed to reject the court's finding, considering the burden of proof.

[10] The voter Dobbins moved with his wife from Galveston, Tex., to Chicago, Ill., about January 1, 1911. He had entered the employ of the Capital Freehold & Investment Company, under contract, as land commissioner, which expired January 1, 1914. His duties as land commissioner kept him in the Panhandle of Texas, where the company's lands were situated, the principal part of the time, and in April, 1912, he purchased a lease contract on a bungalow in Friona, Parmer county, which expired January 1, 1913, and moved to that place with his wife in April. He testified that they moved to Parmer county "to make it our home during the rest of the time I was under contract with the Capital Company." Before he moved from Galveston his furniture had been burned, and when he went to Chicago he bought furniture, rented a flat and began to live in that city. He sublet the flat in Chicago, "for the period of six months with the privilege of extension." He said, "We had the flat in Chicago under a lease and could not get released." He testified that in October or November, 1912, his sublessee did not desire to renew the lease for their furniture in Chicago, and being unable to heat the bungalow his wife went to Chicago, for the winter, until the apartment could be sublet, which was done in May, 1913. In the spring of 1913 he moved some of his furniture from Chicago and bought some, changing his place of residence from Friona to Farwell. There was testimony of declarations by Dobbins that they were "camping out" while in Texas. There was testimony also of statements in regard to Chicago as his home, and particularly a declaration that he did not claim his residence in Texas, at the time of a certain bond election, held in August, 1913, and gave that as his reason for not voting at that election in Parmer county. The trial court accepted Dobbins' statements as to his residence in Texas, and unless the statements that he moved to Parmer county to make his home for the time he was under contract with the company, would reject him as a voter, on account of his residence, the court had a right

upon the testimony to receive the vote. Appellees cite McCrary on Elections, § 70, and the report of a case of Cessna v. Meyers, found in the appendix on page 264, to the effect that where a person goes to a place to work for a stated period only, he nevertheless acquires a residence there, if he has no other home to which he expects to return when his employment ceases. Appellees very pertinently remark that if the law were as stated by the appellants, a school-teacher, a Methodist minister and other classes of persons who are employed for a stated period of time, for that reason alone, may not acquire a residence and become legal voters. Contestants, of course, couple this contractual condition with other testimony in regard to Dobbins' intention as to a home in Chicago. The court resolved it, however, and under the rule we are unable to overturn it. See Langhammer v. Munter, 80 Md. 518, 31 Atl. 300, 27 L. R. A. 331; Pedigo v. Grimes, 113 Ind. 148, 13 N. E. 702, 703.

[11] M. B. Tisdell lived in Parmer county from 1905 to 1911, inclusive, with his family, owning an improved farm near Farwell. He was about 75 years of age and in the spring of 1912 left with his family to Hall county, renting land and raising a crop in that county during the years 1912 and 1913. He retained his home and farm in Parmer county, and continued to own the same to the time of the election. On account of a drought in Parmer county, extending for a period of 4 years, he testified that:

"It became necessary for us to go where we could raise a money crop to enable me to pay out my property at Farwell, so I moved temporarily to Hall county for that purpose."

He said he never intended to make the latter county his home, but intended to return to Parmer county and maintain his permanent home on his farm near Farwell, and at the time his depositions were taken, he was moving back to the latter county. The court had the right to receive him as a voter.

[12] W. W. Stroud resided at Farwell with his wife and children 2 years previous to the death of his wife, and, after the latter's death, he removed to Amarillo, employed at different occupations. He owned a furnished home at Farwell, but removed a part of his household goods to Amarillo, and testified that during the year 1913 he and his sons were in Farwell frequently and spent a great part of the time at that place; that he still owned his residence property at that time and considered Farwell as his permanent place of abode, intending to return as soon as conditions would permit and engage in business at that place; that he did not intend to transfer his place of permanent residence to Potter county or any other place. One Schrieber of Amarillo testified that Stroud, while working for him, from June, 1913, to and including October, 1913, made several visits to Farwell. Residents of Farwell also testified to seeing Stroud on occa-

sions at Farwell during the latter's stay at Amarillo. On the whole, we think the court had the right to reject the challenge. Davis v. State, 75 Tex. 420, 12 S. W. 961; Rathgen v. French, 22 Tex. Civ. App. 439, 55 S. W. 579.

[13] Appellant's assignment in this court, challenging the vote of Claude Rea, does not question the failure to pay a poll tax for the year 1912, nor the lack of an exemption certificate for the purpose of voting. The statement under the assignment is as follows:

"The voter, Claude Rea, testified by deposition taken on April 6, 1914, that he was 22 years of age, and a single man; that his occupation was feeding cattle; that on January 1, 1913, he was working for the V V N's, and had worked for them since October, 1912, all the time and slept in Farwell at the ranch; that he worked for the V V N's in Bailey county, Tex., from April 18, 1913, to October 18, 1913, and slept in Bailey county, Tex., between April 18, 1913, and October 18, 1913, as regularly as he did anywhere else."

The position is that the uncontroverted testimony is to the effect that he usually slept, at nights, from April 18, 1913, to October 18, 1913, in Bailey county, Texas, and that under the statute his residence in Bailey county, at least during that period, disqualifies him as a voter in Parmer county.

The further inference from the testimony is, that this young man owned a small house in Farwell and freighted for the V V N ranch, and when at Farwell lived at the little house; that he had a bed and kitchen outfit in it, and after he quit the ranch he lived in the two-room house in Farwell. It is not shown how much of the time was spent in Farwell while engaged in freighting or other work, nor the length of time he was engaged in freighting for the particular ranch. He said that between April 18, 1913, and October 18, 1913, he slept at nights in Bailey county and he did not know as to the time he slept there, saying that he did so about as regularly as he did anywhere else.

One Hopping testified that he became acquainted with Claude Rea when he was hauling cake for the ranch mentioned; that when he came for a load at Farwell or Texico, he would spend the night in his house; that no one lived in it except himself, and in which he kept his bed and camping outfit.

The testimony as to this voter is so indefinite that it is impossible to form an intelligent conclusion as to the amount of freighting the voter performed and the usual place of sleeping, in the performance of his work. In connection with the deducible fact that he owned a house in Farwell, with a bed and camping outfit in same, using it for a place of abode at times, we sustain the court's finding as to the eligibility of this voter. The burden was upon appellants.

[14] Quoting from appellants' brief:

"Contestants allege that T. O. Cunning cast his vote at Bovina, in precinct 3, for the county seat to remain at Farwell, that his vote was so counted, canvassed, and returned, but that said vote was illegal and void because, but for the

intimidation and threats of partisans of Farwell, said voter would have cast his vote for the county seat to be removed to Bovina."

It is admitted that Cunning cast his vote for Farwell. He was engaged as a pumper for the Santa Fé at Bovina station. He said that in a conversation just before the election, a certain attorney informed him:

"That we would have to vote in favor of the railroad and they did not want to build a depot at Parmerton. * * * It is my understanding that the attorney used the words that I would 'lose my job' during the conversation."

There was a telegram addressed to the agent of the company at Bovina, signed by one of the higher officials of the railroad, which the voter Cunning saw before he voted. This telegram refers to some conversation between the pumper and the attorney, and the agent was instructed to inform the pumper and other employés that the company could not consistently advise them one way or the other; but if it was their intention to work to the company's interest, they should use their judgment as to the manner in which the company would be most benefited. Lucas, the agent, testified that Cunning, "was possibly a little disturbed as to some parties trying to make it unpleasant if we cast our vote in a certain way. I was not."

This agent is still in the employ of the company, and it is not shown how he voted. Cunning further testified that he was under the impression that if he did not vote for Farwell he would be likely to lose his employment with the company, and that he received that impression from both the telegram and the conversation. He said:

"I do not remember whether I intended to vote otherwise for Bovina, but I believe I did. I was in favor of Bovina."

It is noted that the ground of contest is that but for the alleged intimidation this voter would have cast his vote for Bovina. The trial court, in passing upon this question, could have excluded the alleged intimidation and could have concluded that it is not shown that this voter otherwise would have voted for Bovina. The telegram was sent on the 17th of October and the election was held on the 18th. Cunning further testified:

"Earlier in the campaign before election day, I had been in favor of removing the county seat from Farwell and changed my intention after I found I could not get it at Bovina."

Then following is a statement that there was something else that influenced him, also stating the conversation with the attorney and the telegram mentioned. The court found that the evidence was insufficient to show that he was threatened with loss of his employment, and that he was intimidated and caused thereby to vote as alleged.

It is evident that practical considerations had, as a contributing element, caused a change of intention in regard to his vote, before such conversation and telegram, on account of the hopelessness of Bovina's candidacy. It is asserted that his vote for removal to Bovina, under the circumstances, would have had the same legal effect on the result of the election as a vote for remaining at Farwell. Under pre-existing rules, this logic would follow; it is unnecessary to decide the point whether the testimony sufficiently raises intimidation depriving Cunning of his free will as to any predisposition for Bovina.

[15] We think the trial court had the right to infer that C. E. Dodson was a voter in Parmer county, on account of his residence in Farwell. He moved to Farwell either in 1910 or 1911, and had been engaged as a clerk in a dry goods store prior to May, 1913, when the store was burned. He continued to work for the same employer for a month or two subsequent to the fire, collecting debts. It is inferable that the elements contributing to his residence in Farwell were his wife's condition and his accessibility to the public school for his children. He rented a house from one Nobles, and after the cessation of employment in Farwell he made a visit to Oklahoma and upon his return he went to his farm in Bailey county, testifying that at that time it was with the expectation of helping the man employed on the place and getting his folks out of town for a while, but with the intention of returning to Farwell for the purpose of schooling his children, and also that his wife could be near a physician. When he went to his farm seven miles away in Bailey county, in the summer of 1913, he left some of his goods in the rent house at Farwell, stating to Mr. Nobles, the landlord, that either in September or October he desired the house again and was moving out temporarily; that if Nobles had an opportunity to rent the house he could put his household goods in the barn; that after the election he again concluded to resume his residence at the farm and removed the balance of his household goods. The fact that he left a part of his household goods at Farwell is inconsistent with a resumption of permanent residence on the farm and entirely consistent with the intention of returning to Farwell, as a place of continued residence. It is suggested that Dodson does not state that he intended to permanently reside in Farwell; however, he was contestant's witness and we are not informed whether he was ever asked such a question. We are unable to assume that the fact of leaving a part of his household goods in Farwell is merely evidence of a simulated intention to exercise the right of suffrage. The trial court had the right to weigh this testimony, and it is not in such a condition as that we can say that the residence of this voter during the necessary period was in Bailey county, instead of Parmer county.

As to the vote of John Foster, contested

on the ground of residence and failure to pay poll tax, appellants' statement under the twenty-sixth assignment of error is not sufficiently extended. Analyzing further the testimony of H. C. Foster, the father of the voter, and giving it the permissible inferences in favor of the court's findings, for the purpose of supporting it, a different conclusion as to the eligibility of John Foster can be deduced. It would be a repetition of reasons applicable to other voters already discussed. The record does not show that the young man was subject to a poll tax. We sustain the finding.

[16] E. W. (Shorty) Stafford left Portales September 5, 1912, for Farwell, upon a previous arrangement with J. D. Hamlin, of that place, as we infer, for employment. His wife went to Friona, and in January or February, 1913, Hamlin not being able to arrange a house for them in Farwell, suggested that they move to Texico, until a house could be "fixed" for their occupancy. A part of his "stuff" (we assume it was household goods) was left at Farwell when they moved to Texico, and the testimony strongly suggests an intention of returning, and that the residence in Texico was only temporary, except for the following fact: He said while in Texico he started to make the race for city marshal of that place and thought maybe he could stay over there because he was not going to get the house in Farwell. He returned to Farwell prior to May, 1913, moving into the house arranged for him. He further testified in regard to his candidacy for office:

"The reason I did not continue to run for city marshal of Texico was because I didn't claim Texico my home, and because I didn't want it; I could not work on this side and hold office; some of them said I could not run and I don't think my name was ever put on the ticket."

While in Texico he also managed the waterworks and operated a blacksmith shop in Farwell.

We think it can be inferred that his first residence in Parmer county was an abandonment of his original domicile in Roswell, N. M. It is inferable that when he moved across the line into Texico (the two towns being the same except for the boundary) he intended to resume his residence in Farwell, leaving a part of his household goods at that place, with an arrangement for the "fixing" of a house for his return and future occupancy—Hamlin allowing him to use the house in Texico as a matter of accommodation. The trial court could conclude that his abandonment of an intention to run for city marshal was on account of his claim of residence in Farwell. We overrule the assignment.

Other assignments, based upon challenges leveled against other voters counted for Farwell, are unnecessary to decide. We are not disposed to agree with the trial court as to some of them, and others present close questions, inexpedient to discuss. If such votes were deducted from Farwell's total, it is apparent, however, that Parmerton did not receive the majority prescribed under the law, even if you could assume that it is situated within a radius of five miles of the geographical center of the county.

Appellant's assignments, relative to questions of testimony, are unnecessary to discuss in detail. Most of them do not affect, nor are connected with, the findings of the particular voters passed upon. If we rejected the testimony of the railroad officers testifying from the records, in regard to the two Mexicans, it would not change our opinion with reference to the court's findings as to those two voters. The question of the payment of expenses, as applicable to the particular voters discussed here_n, could only affect the vote of Tisdell, which would not alter this result, if the assignment were sustained.

The appellants in this case introduced the testimony of a surveyor as to the geographical center of Parmer county. The certificate of the commissioner of the general land office, though solicited by the county judge before the election, was not mailed, received, or recorded until after the election. Farwell is more than five miles from the center, and a majority of voters voting at an election could move the county seat from that point to another within five miles of such center; in such case the center to be determined by a certificate from the commissioner of the general land office, under the Constitution as well as under the statute.

[17] Appellants' contention is that the certificate in this case has no vitality under the conditions, and that they could prove the center by other and different testimony. "It is an accepted rule of construction that where a power is expressly given by the Constitution and the mode of its exercise is prescribed, such mode is exclusive of all others. Crabb v. School District, 105 Tex. 198, 146 S. W. 529, 39 L. R. A. (N. S.) 601, Ann. Cas. 1915B, 1146. In view of the principle that the selection and designation of county seats is a political question, though the constitutional amendment of 1891 gives the district court power to try all cases of contested election—a most interesting question is presented, but not decided.

Judgment of trial court is affirmed.